```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,             :
                                      :        MEMORANDUM AND ORDER
            -against-                 :        18-cr-228 (DLI)
                                      :
                                      :
ANTHONY STOKES,                       :
                                      :
                    Defendant.        :
-------------------------------------------------------x
```

Defendant Anthony Stokes is charged by indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Indictment, Docket Entry No. 6. On August 17, 2018, Defendant filed a motion to suppress: (1) a firearm and a crackpipe, recovered from Defendant; and (2) Defendant's statements made before and after his arrest involving possession of the firearm and the crackpipe. *See*, Defendant's Memorandum of Law ("Def.'s Mem."), Docket Entry No. 20. The Government opposed the motion. *See*, Government's Memorandum of Law in Opposition ("Govt.'s Mem."), Docket Entry No. 22. Defendant replied to the Government's opposition. *See*, Defendant's Memorandum in Reply ("Def.'s Reply"), Docket Entry No. 23. The Court held a suppression hearing that began on December 18, 2018, and was continued on December 19, 2018. At the hearing, the Government advised that it was not seeking to introduce Defendant's post-arrest statements concerning the crackpipe or the crackpipe itself, but otherwise opposed Defendant's motion.

For the reasons set forth below, Defendant's motion is denied as to admission of the firearm and his statements concerning the firearm. As the Government does not intend to introduce at trial the crackpipe and Defendant's statements concerning the crackpipe, Defendant's motion as to their admissibility is denied as moot.

I.   **FINDINGS OF CREDIBILITY**

Police Officer Patrick Foley and Lieutenant ("Lt.") Ryan Gillis of the New York City Police Department ("NYPD") testified at the hearing on behalf of the Government. Except for the affidavit Defendant submitted in support of his suppression motion (*See*, Affidavit of Anthony Stokes, Docket Entry No. 20-1), Defendant did not testify or present any witnesses. The Court finds the testimony of the Government's witnesses to be credible and discredits Defendant's affidavit.

II.  **FINDINGS OF FACT**

On April 13, 2018, at approximately 12:30 a.m., three NYPD officers, Patrick Foley, Lt. Ryan Gillis, and Richard Danese, all members of an anti-crime team, were patrolling the area of the 79th Precinct. Tr. 12:11 - 13:4, 16:17 - 1 9.[1]  This is a high crime area, with frequent reports of stolen bicycles and other property. Tr. 16:15 - 17. The officers were riding in an unmarked vehicle, with Officer Danese driving. Tr. 54:2 - 7. All three officers were in plain clothes. Tr. 15:9 - 10, 89:18. While traveling eastbound on Gates Avenue near Marcy Avenue, Officer Foley and Lt. Gillis observed Defendant riding a pink woman's style bicycle on the sidewalk of Gates Avenue, which was in violation of New York City Administrative Code § 19-176(b), an arrestable offense. Tr. 14:19 - 16:3, 54:6 - 7, 91:1 - 6. Defendant rode the bicycle on the sidewalk alongside an acquaintance with whom he was conversing, keeping pace with him. Tr. 19:3 - 21:7. The officers made a U-turn, and stopped approximately one car length away from Defendant, parallel to the sidewalk. Tr. 92:1 - 7.

Once Officer Danese pulled the car over, the officers exited the vehicle, and, as they approached Defendant, identified themselves as police officers and directed Defendant to stop.

---

[1] "TR." refers to the transcript of the hearing held on December 18 and 19, 2018.

Tr. 94:1 - 12.  However, instead of stopping, Defendant leaned forward and stood up on the bicycle as if he intended to pedal away.  Tr. 75:14 - 16, 92:1 - 12.  In response, Officer Foley grabbed Defendant by his jacket to prevent him from fleeing.  Tr. 30:7 - 8.  When Officer Foley grabbed Defendant, he also felt a hard object on Defendant's left side that he believed was a firearm.  Tr. 30:11 - 33:4.  In response, Defendant hunched over, clenched his left side with his arm, and began to cough as if he was choking on the chicken wing he apparently had been eating.  Tr. 31:4 - 10.

Officer Foley and Lt. Gillis then removed Defendant from the bicycle and immediately escorted him to the side of a nearby building to administer any necessary aid and conduct a pat down search.  Tr. 31:16 - 17.  While patting down Defendant, Officer Foley again felt the outline of a firearm in Defendant's left jacket pocket, alerted the other officers to presence of a firearm, and attempted to get it by unzipping the pocket.  Tr. 33:1 - 8, 98:16 - 19.  During this entire time, Defendant was struggling, flailing his arms, trying to bite the officers and yelling, demonstrating that his choking claim was false.  Tr. 31:4, 131:4 - 13.  A piece of chicken lay on the ground in front of Defendant.  Tr. 20 - 22.  The officers were able to handcuff Defendant and put him on the ground.  Tr. 96:16 - 97:1.  Officer Foley then attempted to unzip Defendant's jacket to remove the firearm while Officer Danese and Lt. Gillis restrained Defendant.  Tr. 98:16 - 108:3.

While on the ground, Defendant spontaneously stated "I have a gun.  Imma get up and get in the car."  Tr. 34:22 - 36:1.  However, Defendant continued to physically resist removal of the firearm, kicking and biting the officers, while the officers ordered Defendant to desist.  Tr. 98:16 - 108:3.  As Defendant continued to try to bite Officer Foley's hand, at Lt. Gillis' instruction, Officer Foley used a pocket knife to cut the exterior of Defendant's jacket and remove the firearm

3

located inside. Tr. 36:14 - 20. During this time, additional uniformed police officers were called to the scene for backup and crowd control. Tr. 36:17-25.

After the officers secured the firearm, Officer Danese conducted a pat down search and removed a crackpipe from Defendant's jacket. Tr. 10 - 12. As he was removing the items, Officer Danese asked Defendant if what he pulled out of his jacket was a crackpipe, to which Defendant responded, "yes." Body Camera Footage, Def. Ex. C, Docket Entry 20-3, at 5:46. Defendant was arrested. Tr. 37:24 - 38:2. He was not given *Miranda* warnings at the scene.

Officers Foley and Danese were wearing body cameras, which captured the arrest. Tr. 39:8 - 10. While there was a momentary delay in activating the body cameras, they captured most of the police encounter with Defendant once he was taken over to the side of the building and fully corroborate the witnesses' accounts. Tr. 127:23 - 128:4. Additionally, a civilian surveillance camera captured Defendant riding the bicycle on the sidewalk. Tr. 19:14 - 20.

### III. CONCLUSIONS OF LAW

#### A. Defendant's Motion

Defendant contends that the firearm and crackpipe, and his statements regarding possession of both items should be suppressed because Defendant: (1) should not have been arrested for the bicycle traffic infraction based on public policy considerations embodied in the passage of the New York City Criminal Justice Reform Act ("NYC CJRA"); (2) made his statement regarding possession of the firearm while the officers exerted force on him; and (3) made his statement regarding possession of the crackpipe after being questioned by Officer Danese, without first having been given his *Miranda* warnings. The Government counters that: (1) riding a bicycle on a New York City sidewalk is an arrestable offense under the relevant law; (2) there was probable cause to stop and search Defendant; and (3) Defendant's statements concerning the firearm were

4

spontaneously made and were not made in response to any interrogation of the Defendant by the police or due to the police officers' excessive use of force. *See*, Govt.'s Mem. at 5-14.

### B. The Firearm is Admissible

#### 1. There Was Probable Cause for the Stop and Arrest of Defendant

Under New York law, a police officer may arrest an individual without a warrant for "[a]ny offense when he or she has reasonable cause to believe that such a person has committed such offense in his or her presence." N.Y. Crim. P. Law § 140.10(1)(a). This includes petty offenses such as bicycle traffic infractions. *Id* § 140.10(2)(a).

Riding a bicycle on the sidewalk is a traffic infraction under the New York City Administrative Code ("the Code"). N.Y.C. Admin. Code § 19-176(b) ("No person shall ride a bicycle upon any sidewalk unless permitted by an official sign. A person who violates this subdivision may be issued a notice of violation and shall be liable for a civil penalty of not more than one hundred dollars [sic] which may be recovered in a proceeding before the environmental control board."); *See generally*, *United States v. McFadden*, 238 F.3d 198, 201-02 (2001). In addition, the Code provides that an individual who rides a bicycle on a sidewalk "in a manner that endangers any other person or property" shall be guilty of a misdemeanor. N.Y. Code § 19-176(c). Police officers generally have the discretion whether to issue a summons for a traffic infraction. *See*, N.Y. V.T.L. §§ 225(1) and 226(1).

However, under Second Circuit caselaw, whether or not a person has committed a violation under N.Y. Admin. Code § 19-176(c) is irrelevant to the probable cause inquiry where there is sufficient probable cause for a violation under § 19-176(b). Specifically, in light of the general prohibition under New York law against riding bicycles on the sidewalk, police officers have sufficient grounds to believe that a defendant is committing a traffic infraction by riding a bicycle on the sidewalk. *McFadden*, 238 F.3d at 204. Here, the officers on patrol in an unmarked vehicle

in a high crime area after midnight observed Defendant riding a pink woman's style bicycle on the sidewalk. The officers turned their vehicle around to drive in the direction Defendant was riding the bicycle, got out of their vehicle, identified themselves as police officers and directed Defendant to stop and get off his bicycle. Defendant did not comply. Instead, he positioned himself on the bicycle as though he was about to ride away. Officer Foley grabbed Defendant's jacket, placed his hands on Defendant's chest, and felt what he believed to be the outline of a firearm.

At this juncture, the officers were justified in searching Defendant for a firearm, both as a violation of the law and for their own safety. Defendant does not dispute that he was riding a bicycle on the sidewalk. Instead, Defendant contends that the stop was unlawful because, in 2016, the New York City Council enacted the NYC CJRA to combat the over-criminalization of quality of life offenses, which was "having a disparate impact on communities of color throughout New York City." Def.'s Mot. at 7. Defendant further contends that "[t]he plain language of the statute indicates that [Defendant] committed nothing more than a civil violation, thus, reading the statute in a manner to permit a full-blown arrest for a traffic violation seems to be, if not in violation of the legislative intent, contrary to recent reforms in policing." *Id.* at 8. The Government counters that riding a bicycle on the sidewalk is a traffic infraction that provided the officers with sufficient probable cause to believe Defendant was committing an offense in their presence. *See*, Govt.'s Mem. at 6-7.

Defendant also relies on *People v. Hagood*, 93 A.D.3d 533 (1st Dep't 2012), for the proposition that "it is not clear that under New York State law, absent any other indicia of criminality, the mere riding of a bicycle on a sidewalk provides probable cause to arrest." Def.'s Mot. at 7. However, in *Hagood*, the First Department explicitly declined "to decide whether an arrest, and a search incident to that arrest, were justified by the Administrative Code Violation

6

itself . . . , or by the violation coupled with defendant's flight to avoid a summons" because the "circumstances objectively provided probable cause to arrest defendant for several crimes." *Id.* at 534. Here, Defendant failed to comply with the officers' request to stop and instead, appeared ready to flee, raising the officers' suspicion.

Since *McFadden*, courts within the Second Circuit routinely have held that an individual may be arrested when there is probable cause for a bicycle traffic infraction under § 19-176(b). *See*, *e.g.*, *United States v. Spencer*, 563 Fed. App'x 812, 814 (2d Cir. 2014); *United States v. Morillo*, 2009 WL 3254429, at *10 (E.D.N.Y. Aug. 12, 2009); *United States v. Rios*, 2009 WL 2603302, *4 (E.D.N.Y. Aug. 24, 2009). As for the NYC CJRA, Defendant admits that the act does "not specifically address the violation at issue in this case." Def.'s Mot. at 8. Thus, without explicit guidance regarding the scope of the NYC CJRA, *McFadden* is controlling. Notably here, the officers asked Defendant to stop. He refused and kept on riding the bicycle on the sidewalk. Indeed, it appeared to the officers that Defendant's intention was to flee on the bicycle. Defendant refused repeated orders to stop, thus escalating the encounter in a crime ridden area in the middle of the night. An officer put his hand on Defendant's chest to stop him and felt what he believed to be the outline of a gun. It was then that the officer tried to search Defendant who completely and violently resisted the officer's efforts to search him. Moreover, as Defendant pretended to be choking, the officers properly took him to the side of a nearby building both to administer aid and search him for the firearm. Under *McFadden* and its progeny, the officers were entitled to stop and either issue a summons to or arrest Defendant for the bicycle infraction. However, there was more here that heightened the officers' belief that Defendant was committing a serious crime, to wit, possession of a firearm. Accordingly, under the circumstances here, the officers were entitled to stop and search Defendant.

## 2. The Seizure of the Firearm Was Lawful

During a custodial arrest, the Fourth Amendment permits police officers to conduct a full warrantless search of an arrestee's person and the area within his or her "immediate control." *Arizona v. Gant*, 556 U.S. 332, 335 (2009) (internal quotation marks and citation omitted). When a custodial arrest is about to be performed, the search is equally lawful if performed *before*, rather than after the arrest takes place. *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."). Whether or not the arrest is effected is immaterial, so long as an officer could have lawfully arrested the defendant. *United States v. Dupree*, 2016 WL 10703796, at *4 (E.D.N.Y. Aug. 29, 2016) (citing *United States v. Richard*, 563 F.2d 45 (2d Cir. 1977)).

Here, the officers' search of Defendant was incident to the lawful stop of Defendant for a bicycle traffic infraction, that escalated when Defendant refused to comply with a lawful order to stop and get off the bicycle, appeared to be about to flee, and Officer Foley felt the outline of a firearm as he grabbed Defendant's jacket in an effort to stop his flight. Even if the officers lacked probable cause to arrest Defendant at the time he was stopped, Defendant's attempt to flee provides alternative support for the search. *United States v. Muhammad*, 463 F.3d 115, 123-24 (2d Cir. 2006) ("[w]here an officer makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.").

Notably, the search was reasonable in scope. *United States v. Davis*, 111 F. Supp. 3d 323, 339 (E.D.N.Y. 2015) (even if reasonable suspicion supports an investigatory stop and pat down, the scope and duration of the stop still must be within the bounds of the Fourth Amendment). Once

Defendant was taken to the side of the building, Officer Foley again felt what he believed to be an outline of a firearm when he conducted a pat down search of Defendant. Officer Foley first attempted to unzip Defendant's jacket so that the officers could remove the firearm. However, when Officer Foley attempted to unzip Defendant's jacket, Defendant physically resisted, kicking and flailing his arms and trying to bite Officer Foley's hand. Moreover, during this time, Defendant blurted out that he had a gun. As a result, Officer Foley used a knife to cut the firearm out of Defendant's jacket. The conduct of the officers was reasonable under all of the circumstances, especially in light of Defendant's aggressive resistance. Accordingly, the firearm is admissible.

### C. Defendant's Statement Regarding the Firearm is Admissible

After the officers forced Defendant to the ground and handcuffed him in an attempt to remove the firearm from his jacket, Defendant stated, "I have a gun, Imma get up and get in the car." Defendant seeks to suppress this statement, made during the course of his arrest, contending that the officers did not have probable cause to arrest him and, even if they did, the force they applied was unreasonable and caused Defendant to utter an involuntary statement. The Government opposes, contending that the statement was spontaneously made and not in response to interrogation by police or the excessive use of force.

To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436 (1966) ruled that police may not interrogate a suspect who has been taken into custody without first warning the person of his or her right to remain silent and obtain counsel. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). "*Miranda*'s warning requirements apply only to 'custodial interrogation.'" *Id.* at 669 (quoting *Miranda*, 384 U.S. at 477). "Volunteered statements of any kind are not barred by the Fifth Amendment." *Id.* at 478.

"The 'ultimate inquiry' for determining *Miranda* custody . . . is . . . 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Newton*, 369 F.3d at 670 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "[T]he definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980). The Government has the burden of establishing the voluntariness of a statement. *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

Defendant contends that his statement regarding possession of the firearm should be suppressed because it was made involuntarily, and, while "not the product of police interrogation, it is clear that [it was] made in direct response to the physical pressure being exerted on Defendant by the officers." Def.'s Mot. At 9. Defendant claims "he was experiencing extreme pain and shortness of breath and was attempting to explain that to the officers." Def.'s Reply at 5. The Government contends that, "consistent with the footage retrieved from the body-worn cameras of Officers Foley and Danese, this statement was not the product of interrogation." Govt.'s Mem. at 15.

As an initial matter, the Court already has determined that the officers had probable cause to arrest and search Defendant and that the firearm is admissible. Officer Foley's and Lt. Gillis' testimony, as well as the body camera footage, reveal that Defendant announced his possession of the firearm when the officers attempted to remove it in the course of their search and pat down of Defendant, not in response to any interrogation of Defendant. The officers used only that force necessary to secure the firearm, and insure Defendant's safety and that of any civilians in the street. Given that Defendant was screaming, constantly moving, kicking and trying to bite the officers during this process, the officers showed remarkable restraint. The officers did not question

10

Defendant while securing the firearm. Thus, Defendant's statement concerning the firearm was made voluntarily, spontaneously and not as a result of undue force or interrogation.

Accordingly, Defendant's statement in connection with possession of the firearm is admissible.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion to suppress the firearm and his statement concerning the firearm is denied in its entirety. Defendant's motion to suppress evidence of the crackpipe and his statement concerning the crackpipe is denied as moot as the Government has declined to admit the item and statement into evidence.

SO ORDERED.

Dated: Brooklyn, New York
August 2, 2019

/s/
DORA L. IRIZARRY
Chief Judge